1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT

8 FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10 LONDON SHAW,                                    No. 2:15-cv-01604-MCE-AC P

11          Petitioner,

12     v.                                         FINDINGS AND RECOMMENDATIONS

13 HIGH DESERT STATE PRISON
   WARDEN,
14
           Respondent.
15

16          Petitioner is a California state prisoner proceeding pro se with an application for writ of

17 habeas corpus pursuant to 28 U.S.C. § 2254.  This action proceeds on the petition filed on July

18 27, 2015, ECF No. 1, which presents four claims challenging petitioner's 2012 conviction and

19 sentence for second degree murder with an enhancement for use of a firearm in a violent offense,

20 and a gang enhancement; and his 2013 conviction and sentence for the personal and intentional

21 use of a firearm causing great bodily injury or death.  Respondent filed an answer, ECF No. 11,

22 and petitioner filed a traverse, ECF No. 16.

23                                          BACKGROUND

24     I.     First Trial

25          A.  Pretrial Proceedings

26          Petitioner and co-defendant Dominique Givens were charged in Sacramento County with

27 the 2009 murder of Sevon Boles.  The homicide was alleged to have been committed in the

28 course of an attempted robbery and for the benefit of a street gang.

1

On July 14, 2011, the court heard a motion in limine objecting to admission of shell casing evidence. RT 71.[1] The prosecution sought to present evidence about a shooting that had occurred in San Francisco approximately a month after the murder at issue in this case. The evidence was intended to show that petitioner had fired approximately eight shots in San Francisco on July 16, 2009, and that those bullets had been fired from the same gun used in the June 22, 2009 Sacramento shooting. RT 71–109, 111–116; see also CT 209–19 (moving papers), CT 220–21 (July 14, 2011 minute order), and CT 222–25 (petitioner's opposition).[2] The court allowed the evidence, finding that the casings and witness identification from the San Francisco shooting were probative of petitioner's presence at the scene of the Sacramento homicide. RT 106–07. The trial was continued to afford additional time to review the San Francisco evidence. RT 115–16.

Prior to the start of trial, the court again heard arguments on a motion in limine to limit evidence of the San Francisco shooting. RT 180–200; see also CT 246–48 (petitioner's motion in limine no. 6). The court reiterated that it wanted to limit the evidence as much as possible. RT 199.

B. Trial Proceedings

The first trial commenced on May 1, 2012. The prosecution presented the following evidence.

LaToya Heckard was an eye witness to the San Francisco shooting. Outside the presence of the jury, the court conducted a California Evidence Code section 402 hearing to determine the admissibility and scope of her testimony. The court ruled that Heckard could testify that she saw petitioner fire a gun on July 16, 2009, but was not to testify whether anybody had been shot or

---

[1] "RT" refers to the Reporter's Transcript on Appeal. There are five volumes of the Reporter's Transcript of the first trial, and seven volumes of the Reporter's Transcript that combine the first and second trials. For reference, the court will refer to the combined Reporter's Transcript volumes 1 through 7.

[2] "CT" refers to the Clerk's Transcript on Appeal. There are two volumes of the Clerk's Transcript for the first trial and three volumes of the Clerk's Transcript that combine the first and second trials. For reference, the court will refer to the combined Clerk's Transcript volumes 1 through 3.

killed; the witness was cautioned that her testimony was to be "very limited." RT 289–91. The court further ruled that Heckard could testify that she had heard petitioner claim an affiliation with a particular gang, but could not provide further information regarding the gang because she was not testifying as an expert witness. RT 296–98.

Heckard testified before the jury as follows. She had known petitioner since he was about five or six living in the Kirkwood area in San Francisco. RT 302–03. Heckard is familiar with a group or a gang in San Francisco that refers to itself as Kirkwood BNT. BNT stands for Broke Nigga's Thievin' ("BNT"), and Heckard had heard petitioner claim that gang. RT 304. Heckard testified to seeing petitioner hang out with other members that she thought were BNT members. RT 306. Heckard had three children in July 2009. Her son was nine and she had two daughters ages four and seven or eight. RT 307. Heckard was in the front passenger seat in a vehicle that was driving in the Kirkwood area. RT 309–10. Her children's father, Delvon Fields, was driving the car with her three children and Mr. Fields' mother in the back. RT 310. Heckard identified the location of the vehicle and direction and course it headed on a map for the jury. RT 310–11. The vehicle came to a stop at a red light while Heckard was on the phone turned towards the passenger window. RT 313. Then she heard the car window shatter. RT 313. Heckard testified that she saw petitioner fire a gun from the car next to the driver side of the vehicle she was in. RT 314. Heckard identified a photograph of the vehicle she was in with holes in the door that were not there before that shooting. RT 315. Heckard testified that she saw petitioner fire a weapon during the shooting. RT 319. As the Court of Appeal's opinion notes, the evidence involving the children and the driver's mother was not mentioned in the pretrial 402 hearing.[3] People v. Shaw, No. C072207, 2014 WL 4104676, at *3 n.2 (Cal. Ct. App. Aug. 21, 2014) (unpublished).

In addition to Heckard's testimony regarding the San Francisco shooting, the prosecution presented forensic ballistic evidence linking the gun used in San Francisco to the one used to kill Sevon Boles in Sacramento on June 22, 2009. Nine nine-millimeter Remington Peters Luger

---

[3] The undersigned has independently reviewed the trial record and confirms the accuracy of the state court's recitation of the evidence presented at trial, including the excerpts that are cited herein.

casings plus one bullet fragment were found at the scene of the San Francisco shooting. All nine casings were fired from the same firearm. RT 373. As the Court of Appeal's summary states:

> Nine nine-millimeter Remington Peters Luger casings found at the scene of the San Francisco shooting were fired from the same gun as the two nine-millimeter casings found at the scene of the Sacramento-Boles shooting.
>
> The five .22-caliber casings found at the scene of the Sacramento-Boles shooting were fired from the Beretta seized from [co-defendant Dominique Givens ("Givens")] in San Francisco. And the two bullets found in Boles's body, as well as another bullet fragment found at that shooting scene, were probably fired from this Beretta.
>
> Boles died from gunshots to his chest and left thigh; he had a baggie of marijuana in one of his pockets.
>
> The police also found two bicycles near Boles.

Shaw, 2014 WL 4104676, at *2.

The Sacramento victim, Sevon Boles ("Boles"), also had a total of $15 on him, which was recovered by police officials after the shooting. RT 645.

Regarding the Sacramento shooting, the prosecution presented several witnesses. Stepphanya Spade ("Spade") testified that she lived in the Willow Pointe Apartments with her friend Reebie Flowers ("Flowers") and Flowers' daughter. RT 408. Spade testified that petitioner and co-defendant Givens stayed in her apartment for a couple days. RT 409. The Sacramento shooting occurred while they were staying there. RT 411. The day before the shooting, Spade testified that she saw a gun in the living room while Flowers was cleaning the apartment. RT 416. Petitioner took the gun and left. RT 417. The evening of the Sacramento shooting, Spade testified that she was in her apartment with a friend, Flowers, and Flowers' daughter. RT 417–18. Spade heard gunshots and saw petitioner running to the other side of the apartments with a gun in his hand saying "I got hit. I got hit." RT 418–19. Spade testified that she saw sparks from the gun when she was sitting in her chair, and the sparks were right below from where petitioner was running. RT 419. Spade saw Givens running the opposite direction from petitioner. RT 419. Spade testified that she saw a female who stayed in the apartments running around screaming, "Where's my boyfriend, Where's my boyfriend?" RT 422–23. Spade

testified that she observed petitioner was hit on his leg because he was limping.  RT 425.

Flowers also testified regarding the night of the Sacramento shooting.  Flowers testified that she lived with Spade at the apartment complex where the shooting took place, and that she met petitioner a few days before the shooting.  RT 508.  Flowers testified that when she and Spade were cleaning the apartment, Spade picked up a shirt and a gun fell out of it.  RT 512.  According to Flowers, she and Spade said that it was not cool, and petitioner got up, picked up the gun, and put it in his waistband.  RT 512–13.  The night of the Sacramento shooting, Flowers was in her apartment with her daughter, Spade, and Spade's boyfriend's cousin.  RT 516.  Flowers saw lights from firearms and heard gunshots coming from the direction she saw petitioner head after he left her apartment.  RT 518–19.  Flowers saw petitioner running to the apartment below her apartment limping, saying he had been hit, and asking someone to give him a ride to the hospital.  RT 519, 524.  Flowers identified the locations in the apartment complex on a diagram where she saw petitioner before and after the Sacramento shooting.  RT 521–25.

Thomas Sims ("Sims") also testified during the prosecution's case in chief.  Sims testified that he became a member of a gang called Kirkwood or BNT.  RT 580.  As the Court of Appeal's statement of the case indicates, Sims had "literally a score of charges pending against him" and "testified pursuant to a prosecution deal."  Shaw, 2014 WL 4104676, at *2; RT 592–94.  Sims testified that he considered petitioner a member of Kirkwood BNT for over fifteen years.  RT 595.  In June 2009, Sims noticed petitioner was limping around and when he asked petitioner about it, petitioner told him that there was an incident and he was accidentally shot.  RT 598.  Sims testified the injury was to petitioner's leg.  RT 599.  According to Sims' testimony, petitioner told him that he was "hitting licks," which refers to robbing someone.  RT 599.  Petitioner told Sims that he and Givens came across an individual who did not comply, so petitioner started wrestling with him and Givens shot in his defense and accidentally shot petitioner.  RT 600.

Leanna Lathum ("Lathum") testified that she was living with Boles at the time of the Sacramento shooting in the apartment complex where the shooting took place.  RT 922–23.  Latham saw their friends show up, told Boles, and Boles left the apartment and went downstairs.

RT 923. Boles then came back upstairs, grabbed a do-rag, and went back downstairs. RT 924. A few minutes after that, Lathum opened the door and asked for a cigarette. RT 925. Lathum saw a man she had never seen before with Boles; the man was next to Boles on a bike. RT 924. After asking for the cigarette, Lathum testified that she closed the door and then heard gunshots maybe one or two minutes later. RT 925, 929. Lathum ran outside and saw Boles' shoes on the ground. RT 925. She then started screaming and asking what happened and what is going on. RT 925. Lathum identified petitioner as the person she saw with Boles just before the shooting. RT 933.

Co-defendant Givens testified on his own behalf as follows. According to Givens, petitioner asked him to travel to Sacramento in June 2009, the Saturday before the Sacramento shooting. RT 945. Givens spent the night in the apartment complex where the shooting took place, in Spade and Flowers' apartment, that Saturday and Sunday night. RT 948. Petitioner also stayed in Spade and Flowers' apartment. RT 948. Givens testified that the following Monday, June 22, 2009, a shooting took place at the apartment complex; Givens had been around the building with a girl right before it happened and had gone alone to the store on a bike to get a soda. RT 949–50. After the shooting, Givens ran towards a parking lot and saw petitioner and another guy run into the apartment complex. RT 951. During cross-examination, Givens identified the other guy as the victim. RT 1015. Givens then ran into the same apartment complex and the other guy ran out. RT 952. Then Givens saw petitioner in a vacant apartment who handed him two guns. RT 952. Givens hesitated to take the guns and petitioner threw the guns onto a clothes hamper and ran out saying he was hit. RT 982. He testified on cross-examination that a couple hours later, "some guys from the apartment complex came, asked [Givens] where [the guns] were. [He] pointed to them and they took 'em." RT 991. Givens did not know their names. RT 991. Givens then stayed in the vacant apartment complex until the next morning when a female acquaintance took him to the Greyhound bus station. RT 952–53.

In August 2009, San Francisco police searched Givens and found on him a firearm that he purchased from petitioner within the past month. RT 954–55. On cross-examination, Givens testified that he purchased the gun from petitioner for $80 and knew it was one of the guns he had seen at the Sacramento apartment complex. RT 1001. After Givens was released from jail, he

1   received a phone call from petitioner who told him that the gun was "involved in Sacramento."

2   RT 956, 1002.  According to Givens, "And that's when [he] found out that it was actually a

3   murder out here."  Id.  Givens admitted that he wanted to be a member of Kirkwood BNT but

4   denied being a member.  RT 957.  On cross-examination, Givens admitted to writing rap lyrics

5   and gang graffiti in a notebook representing Kirkwood BNT.  RT 1009–11.  Givens denied

6   having a gun on June 22, 2009, shooting Boles on June 22, 2009, intending to rob Boles on June

7   22, 2009, having a conversation with petitioner to rob somebody on that date, and shooting

8   petitioner on accident.  RT 965.  Givens knew petitioner to be a member of Kirkwood BNT since

9   2002 or 2003.  RT 971–72.

10       The prosecution presented testimony of San Francisco police detective Leonard Broberg

11  ("Broberg") as an expert on African-American gangs in the Bayview Hunter's Point area.  RT

12  785–90; see generally RT 785–849.  Broberg explained that there are six validated gangs in the

13  Bayview Hunter's Point area, and a couple more gangs that are documented.  RT 798.  A

14  validated gang means that "somebody within that particular gang has either come to court and the

15  courts have found that there's enough evidence that the gang exists," which validates the gang's

16  existence.  RT 798.  Broberg explained that in San Francisco they use a strict list of elements as

17  validation criteria.  RT 799.  Kirkwood BNT is one of the six validated gangs in the Bayview

18  Hunter's Point area.  RT 800–01.

19       Broberg testified that Kirkwood is an informal gang in which someone has a position in

20  the gang by putting in work for the gang, which includes committing acts of violence.  RT 810.

21  To become part of the Kirkwood gang a person has to grow up in the neighborhood where the

22  gang was or become friends with some of the gang members.  RT 811.  Broberg testified that

23  Kirkwood BNT's primary activities include narcotics violations or sales, weapons violations,

24  guns, assault rifles, robberies, carjacking, and witness intimidation.  RT 812.  With regard to

25  whether the Sacramento shooting was committed for the benefit of the Kirkwood BNT gang,

26  Broberg explained during his testimony that "the whole culture of gangs is about the

27  interchangeability of fear and respect.  In order to be respected, you need to be feared.  And in

28  order to be feared, you have to show that you're willing to step up."  RT 846.  He further

explained that "[d]uring the course of conversations, you know, individuals are talking about hitting other individuals of gangs or committing robberies. It's a very specific act of violence, especially when they're going to shoot somebody. So now that individual within that gang has established a reputation within the gang, showing other gang members he's willing to step up, commit crimes, put in some work for the gang, but he's also sending a message outside the gang." RT 847. Broberg concluded that "[w]hat happened here in Sacramento, that information got back to San Francisco and to individuals back there. So both of the individuals that were involved in this enhanced their reputations by the use of the gun and by shooting the individual that they were attempting to rob." RT 847–48. Broberg agreed that the actions benefited both individual gang members within the gang, Kirkwood BNT, and Kirkwood's reputation in intimidation in the community as word spreads. RT 848.

Petitioner stipulated he is a member of Kirkwood BNT and is associated with a member of Kirkwood BNT, including on June 22, 2009. RT 773, 820; RT 1121. The parties also stipulated that Kirkwood BNT is a criminal street gang under California Penal Code sections 186.22(b)(1) and 186.22(E)(1); and that there are the requisite three predicate crimes to satisfy the requirements of the Penal Code in determining whether Kirkwood BNT is a criminal street gang. RT 1121.

Before closing arguments, petitioner moved to have part of Broberg's testimony stricken, namely "any reference to any additional communication to himself beyond Mr. Sims" regarding whether word had gotten back to San Francisco regarding the shooting and whether petitioner was involved. RT 1151–53. In response, the prosecution argued that Broberg testified on direct that it was his opinion that the crime benefited the gang and it was only in response to petitioner's counsel's question that he elaborated that he "had spoken with other officers that related to him, through a confidential informant, that word had gotten back to San Francisco regarding the shooting, and Mr. Givens and Mr. Shaw's involvement in that shooting." RT 1151–52. The court denied the motion as untimely, finding that "without reference to either the transcript or contemporaneous with the testimony, there's very little the Court can do without seeing the totality of the testimony. It's awkward for [the court] to either order the jury to disregard a

portion of his testimony without seeing how it related to the totality of his testimony, whether it came from direct, whether a response to cross or redirect, recross."  RT 1154.

As the Court of Appeal summary recounted the conclusion of the first trial:

> After much deliberation, a jury convicted defendant London Ramon Shaw of second degree murder of Sevon Boles (Pen. Code, § 187, subd. (a)),[] and sustained enhancement allegations that defendant personally used a handgun (§ 12022.53, subd. (b)) and committed the offense for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)). The jury acquitted defendant of attempted robbery of Boles. (§§ 664/211.) The jury could not reach a decision on whether defendant, or another principal in this gang-related offense, personally and intentionally discharged a firearm causing death. (§ 12022.53, subds. (c), (d), (e).) Nor could the jury reach a decision on any of the similar substantive or enhancement charges against defendant's codefendant, Dominique Givens.

Shaw, 2014 WL 4104676, at *1 (footnote omitted).

On September 14, 2012, the trial court heard petitioner's motion for a new trial.  RT 1348; see also CT 481–90.  The defense moved the court to set aside the gang enhancement under California Penal Code § 186.22(b)(1), arguing that "the jury relied on unsubstantiated, if not completely contrived, evidence by a gang expert."  RT 1349.  Petitioner based his argument in part on Broberg having notes that were not given to the defense.  RT 1350.  The prosecution opposed the motion, arguing in part that Broberg "gave detailed testimony in regards to how this crime benefited the gang."  RT 1353.  The trial court summarized the evidence at trial and denied the motion, concluding that "there is more than sufficient evidence to support [the jury's] findings . . ., including the gang enhancement."  RT 1358–64.

Petitioner was sentenced for second degree murder with a gang enhancement for an indeterminate term of 15 years, consecutive to the determinant term of 10 years for the personal use of a firearm.  RT 1367–68.  At sentencing, the prosecution confirmed that it would retry petitioner on the charge that he personally and intentionally discharged a firearm causing death (CAL. PENAL CODE § 12022.53(c)–(e)), and that he committed the offense for the benefit of, or in association with, a criminal street gang (CAL. PENAL CODE § 186.22 (b)(1)).  RT 1369–70.  A September 28, 2012 trial date was requested.  RT 1370.

////

II.    Trial Two

A.    Trial Proceedings

The second trial commenced on January 9, 2013 with jury selection. RT 1419. On January 10, 2013, the trial court heard petitioner's motion to dismiss based on his statutory right to a speedy trial (see Cal. Penal Code § 1382(a)(2)). RT 1456. The motion was denied initially, RT 1466, and on further consideration, RT 1582, 1588-92.[4]

Witnesses Flowers, Sims, Lathum, and Givens did not testify at the second trial. Heckard's testimony was similar to her testimony in the first trial summarized above, with few exceptions. Heckard did not testify about petitioner's affiliation with Kirkwood BNT and did not identify the location of the vehicle on a map for the jury. RT 1510–78. Spade's testimony was similar to her testimony in the first trial with the following exceptions. RT 1595–1662. She testified that she did not recall testifying in the first trial that she saw sparks coming from the direction where petitioner had been running or saw a gun in petitioner's hand. RT 1654–55. Spade also did not testify that petitioner said, "I got hit. I got hit." Nor did Spade testify that she observed petitioner was hit on his leg. However, the jury had access to two interviews with Spade dated September 15, 2009 and November 18, 2009 during which she recounted these eyewitness observations. CT 748–87. Spade did not recall Givens' name at the second trial.

The jury found petitioner guilty of personally and intentionally discharging a firearm and caused great bodily injury or death within the meaning of California Penal Code § 12022.53(e). RT 1878. Petitioner was sentenced to a total term of forty years to life for second degree murder and related enhancements. RT 1889.

B.    Post-Conviction Proceedings

On September 20, 2013, petitioner filed a timely, consolidated appeal with the California Court of Appeal, Third Appellate District. Lodged Doc. 1. Petitioner argued that (1) the trial court erred by allowing the prosecution to admit inflammatory evidence of the San Francisco shooting, (2) the gang detective's inadmissible opinion that, based on his review of the police

---

[4]  Details regarding the speedy trial issue are set forth in relation to petitioner's Claim Four, infra.

reports, petitioner committed the crime to benefit a gang prejudiced petitioner, (3) there was insufficient evidence to support the gang enhancement, and (4) the cumulative errors warrant reversal. Id. On August 24, 2014, the California Court of Appeal affirmed petitioner's judgment of conviction and sentencing in a reasoned opinion. Shaw, 2014 WL 4104676.

On October 1, 2014, petitioner appealed to the California Supreme Court, alleging that (1) the gang detective's inadmissible opinion that, based on his review of the police reports, petitioner committed the crime to benefit a gang prejudiced petitioner, (2) there was insufficient evidence to support the gang enhancement, (3) the trial court erred by allowing the prosecution to admit inflammatory evidence of the San Francisco shooting, and (4) counsel was ineffective in failing to timely assert his right to a speedy trial on the enhancement. Lodged Doc. 5. On November 12, 2014, the California Supreme Court summarily denied review. Lodged Doc. 6.

On May 19, 2015, by operation of the prison mailbox rule, petitioner filed a petition for habeas corpus in this court.[5] ECF No. 1. On March 15, 2016, respondent answered. ECF No. 11. On September 9, 2019, petitioner filed his traverse. ECF. No. 16.

## STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. Harrington v. Richter, 562 U.S. 86, 99

---

[5] See Houston v. Lack, 487 U.S. 266 (1988) (establishing rule that a prisoner's court document is deemed filed on the date the prisoner delivered the document to prison officials for mailing).

(2011). State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state-law procedural principles to the contrary. Id. at 99 (citing Harris v. Reed, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." Id. at 99.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court. Lockyer v. Andrade, 538 U.S. 63, 71–72 (2003). Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether . . . the particular point in issue is clearly established by Supreme Court precedent." Marshall v. Rodgers, 569 U.S. 58, 64 (2013).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407–08. It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520–21 (2003).

Review under § 2254(d) is limited to the record that was before the state court. Cullen v. Pinholster, 563 U.S. 170, 181 (2011). The question at this stage is whether the state court reasonably applied clearly established federal law to the facts before it. Id. at 181–82. In other words, the focus of the § 2254(d) inquiry is "on what a state court knew and did." Id. at 182. Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review is confined to "the state court's actual reasoning" and "actual analysis." Frantz v. Hazey, 533 F.3d 724, 738 (9th Cir. 2008) (en banc). A different rule applies where the state court rejects claims summarily, without a reasoned opinion. In Richter, supra, the Supreme Court held that when a state court denies a claim on the merits but without a reasoned opinion, the federal habeas court

12

must determine what arguments or theories may have supported the state court's decision, and subject those arguments or theories to § 2254(d) scrutiny.  Richter, 562 U.S. at 101.

DISCUSSION

I.     Claim One:  Inadmissible Gang Expert Opinion that Petitioner Committed the Sacramento Shooting

A.  Petitioner's Allegations

Petitioner contends that allowing gang expert Broberg to offer an opinion that the shooting was for the benefit of the BNT gang, of which petitioner was a member, necessarily and impermissibly includes the expert's opinion that he believed petitioner committed the Sacramento shooting.  ECF No. 1 at 5.

B.  The Clearly Established Federal Law

Errors of state law do not present constitutional claims cognizable in federal habeas. Pulley v. Harris, 465 U.S. 37, 41 (1984).  To the extent petitioner claims his due process rights were violated, the erroneous admission of evidence violates due process only if the evidence is so irrelevant and prejudicial that it renders the trial as a whole fundamentally unfair.  Estelle v. McGuire, 502 U.S. 62 (1991).

C.  The State Court's Ruling

Petitioner challenged the gang expert opinion on direct appeal.  The California Court of Appeal decision, Shaw, 2014 WL 4104676, constitutes the last reasoned decision on the merits because the state supreme court denied discretionary review, Lodged Doc. 6.  See Ylst v. Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

The California Court of Appeal ruled as follows:

> First, defendant contends that Detective Broberg's opinion that defendant committed the Boles murder for the benefit of the BNT gang was improperly admitted because the prosecutor's questioning eliciting this opinion was not phrased as a hypothetical, and the jury was just as qualified as Broberg to determine who murdered Boles.
>
> Weaving through defense counsel's sustained objections, Detective Broberg opined essentially that based on the police report of the Sacramento–Boles shooting and on his training and experience, the crime was committed for the benefit of BNT. Broberg explained, "What happened here in Sacramento, that information got back to

13

San Francisco.... So both of the individuals that were involved in this enhanced their reputations by the use of the gun and by shooting the individual that they were attempting to rob."

Detective Broberg did not testify explicitly that defendant committed the Boles murder. Rather, Broberg testified that this murder was committed for the benefit of BNT and he explained the benefit (enhancing the reputation of BNT and defendant for violence). The jury was well aware that it had been empaneled to determine the charges here. In any event, if Broberg crossed the line of expert witness propriety in this regard, defendant was not prejudiced. On the issue of whether a crime is gang related, a gang expert is permitted to respond to hypothetical questions from the prosecutor that closely track the evidence in a thinly disguised manner. (People v. Vang (2011) 52 Cal.4th 1038, 1041, 1048 (Vang).)

Shaw, 2014 WL 4104676, at *4.

### D. Objective Reasonableness Under § 2254(d)

Respondent argues correctly that petitioner does not clearly present a due process claim in his petition. ECF No. 11 at 15–16. Nevertheless, as respondent acknowledges, a passing reference to a due process violation was made in petitioner's Court of Appeal opening brief. Appellant's Opening Br. at 25, Sept. 20, 2013. To the extent the claim before this court is based only on California law, it must be denied as such pursuant to Pulley v. Harris, supra. To the extent it may be construed as a due process claim, the claim must be denied pursuant to § 2254 and on the merits. To the extent if any that the claim could be considered procedurally defaulted, the undersigned nonetheless recommends denial on the merits. See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002) (citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)).

The Court of Appeal's holding that the testimony was not improper is a determination of California law that may not be revisited here. See Lewis v. Jeffers, 497 U.S. 764, 780 (1990) (explaining that federal habeas corpus relief does not lie for errors of state law); Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (explaining that a federal habeas court is bound by a state court's interpretation of state law). The only question cognizable in this court is whether admission of the testimony rendered the trial fundamentally unfair. Estelle, 502 U.S. at 70. In light of the trial record as a whole, it was not unreasonable of the Court of Appeal to answer that question in the negative. The defense had a full opportunity to cross-examine Broberg and to argue the issue to

14

the jury, and the jury was properly instructed regarding the evaluation of expert testimony and the function of hypothetical questions.[6] The jury was also instructed on, among other things, reasonable doubt, a jury's duty to decide what the facts are based on only the evidence that has been presented at trial, and the sufficiency of evidence.[7] This federal habeas court must presume that the jurors followed these instructions, which would have lessened any possible prejudice or unfairness by the admission of Broberg's testimony. Weeks v. Angelone, 528 U.S. 225, 234 (2000) (stating that "[a] jury is presumed to follow its instructions" (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987))).

Moreover, the state court reasonably held that Broberg did not explicitly testify that petitioner committed the Boles murder. Even assuming for purposes of argument that the jury would have understood Broberg to be expressing an opinion as to petitioner's guilt, no United States Supreme Court precedent clearly establishes that due process is violated by an expert opinion on an issue ultimately to be resolved by the jury. See Moses v. Payne, 555 F.3d 742, 761 (9th Cir. 2009) (rejecting as unsupported by clearly established federal law a claim that opinion testimony improperly intruded on the province of the jury and thereby violated due process); see also Briceno v. Scribner, 555 F.3d 1069, 1077 (9th Cir. 2009) (explaining that the Supreme Court has not yet issued an explicit ruling "support[ing] the general proposition that the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the

---

[6] CALCRIM No. 332 was given to the jury, which reads, in part: "Witnesses were allowed to testify as experts and to give opinions. You must consider the opinions, but you are not required to accept them as true or correct. The meaning and importance of any opinion are for you to decide . . . . You must decide whether information on which the expert relied was true and accurate. You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence. [¶] An expert witness may be asked a hypothetical question. A hypothetical question asks the witness to assume certain facts are true and to give an opinion based on the assumed facts. It is up to you to decide whether an assumed fact has been proved. If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion." CT 335.

[7] See CT 321 (the prosecution must prove petitioner guilty beyond a reasonable doubt), 316 (it is the jury's duty to decide what the facts are based only on the evidence that has been presented in the trial), and 324 (before relying on circumstantial evidence to conclude that a fact necessary to find petitioner guilty has been proved, the jury must be convinced that the prosecution has proved each fact essential to that conclusion beyond a reasonable doubt).

trier of fact" (quoting <u>Moses v. Payne</u>, 543 F.3d 1090, 1105 (9th Cir. 2008))); <u>Maquiz v.</u>

<u>Hedgpeth</u>, 907 F.3d 1212, 1217 (9th Cir. 2018).  Indeed, the United States Supreme Court has

never held that the admission of any type of evidence violates due process.  <u>Holley v.</u>

<u>Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009) (explaining that the Supreme Court has never

"made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

process violation sufficient to warrant issuance of the writ").  Because the Court of Appeal's

decision was not contrary to or an unreasonable application of Supreme Court precedent, this

court may not grant the writ based on petitioner's position that Broberg's opinion "necessarily,"

ECF No. 1 at 5, included an opinion on an ultimate fact.  <u>Carey v. Musladin</u>, 549 U.S. 70, 77

(2006) ("Given the lack of holdings from this Court . . ., it cannot be said that the state court

'unreasonabl[y] appli[ed] clearly established Federal law.'" (citing 28 U.S.C. § 2254(d)).

For these reasons, petitioner is not entitled to relief on this claim.

II.  <u>Claim Two:  Insufficient Evidence to Prove Petitioner Committed the Sacramento Shooting to Benefit a San Francisco Street Gang</u>

A. <u>Petitioner's Allegations</u>

Petitioner alleges that there was no reliable evidence that the Sacramento shooting

benefited the San Francisco gang or enhanced its reputation.  ECF No. 1 at 7.  Petitioner further

claims that membership in a gang by itself is insufficient to prove the allegation.  <u>Id.</u>

B. <u>The Clearly Established Federal Law</u>

Due process requires that each essential element of a criminal offense be proven beyond a

reasonable doubt.  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  In reviewing the sufficiency of

evidence to support a conviction, the question is "whether, after viewing the evidence in the light

most favorable to the prosecution, *any* rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319

(1974).  If the evidence supports conflicting inferences, the reviewing court must presume "that

the trier of fact resolved any such conflicts in favor of the prosecution," and the court must "defer

to that resolution."  <u>Id.</u> at 326; <u>see also</u> <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274–75 & n.13 (9th Cir.

2005).

16

In order to grant a writ of habeas corpus under AEDPA, the court must find that the decision of the state court reflected an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the case. <u>Juan H.</u>, 408 F.3d at 1274–75. The federal habeas court determines the sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Chein v. Shumsky</u>, 373 F.3d 978, 983 (9th Cir. 2004).

C. <u>The State Court's Ruling</u>

Petitioner raised his insufficient evidence claim on direct appeal. The California Court of Appeal decision, <u>Shaw</u>, 2014 WL 4104676, constitutes the last reasoned decision on the merits because the state supreme court denied discretionary review, Lodged Doc. 6. <u>See</u> <u>Ylst</u>, 501 U.S. 797; <u>Ortiz</u>, 704 F.3d at 1034.

The California Court of Appeal ruled as follows:

> For his second point, defendant asserts there was no admissible reliable evidence to support the basis of Detective Broberg's opinion that the Sacramento–Boles shooting would benefit the BNT gang and defendant by enhancing their violent reputations; that basis, as noted, was that information of the Sacramento–Boles shooting had gotten back to San Francisco. We disagree.
>
> When defense counsel cross-examined Detective Broberg as to the basis of his opinion, Broberg replied that he relied on what BNT member Sims had told him, on what another San Francisco police officer had told him (Broberg identified this officer and noted this information came from that officer's informant), as well as on other unidentified people in San Francisco who were aware of what had occurred (but Broberg had not talked with those people).
>
> Expert testimony may properly be based on material that is formally inadmissible as evidence so long as that material is of a type reasonably relied upon by similar experts to form their opinions, and is itself reliable. (<u>People v. Gardeley</u> (1996) 14 Cal.4th 605, 618.)
>
> As a basis for forming his opinion, Detective Broberg could properly rely on hearsay information received in his conversation with BNT gang member Sims, and from another police officer (who is presumed reliable). (<u>People v. Thomas</u> (2005) 130 Cal.App.4th 1202, 1209–1210 [a gang expert may give opinion testimony based upon hearsay statements, including conversations the expert has had with gang members and with the expert's colleagues]; <u>People v. Vy</u> (2004) 122 Cal.App.4th 1209, 1223, fn. 9 [accord]; <u>see</u> <u>People v. Hill</u> (1974) 12 Cal.3d 731, 761, <u>overruled on another point in People v. De Vaughn</u> (1977) 18 Cal.3d 889, 896, fn. 5; <u>see also</u>

17

<u>People v. Hill</u> (2011) 191 Cal.App.4th 1104, 1131 & fn. 18.) As for the "other unidentified people" with whom Broberg had not talked, that information may not be reliable; but we deem this information harmless in light of the reliable information Broberg cited and the fact that this unreliable information was presented primarily as a basis for the jury to evaluate Broberg's opinion rather than for the information's truth. (<u>People v. Thomas</u>, <u>supra</u>, 130 Cal.App.4th at pp. 1209–1210; <u>People v. Vy</u>, <u>supra</u>, 122 Cal.App.4th at p. 1223, fn. 9; <u>see People v. Hill</u>, <u>supra</u>, 12 Cal.3d at p. 761; <u>see also</u> <u>People v. Hill</u>, <u>supra</u>, 191 Cal.App.4th at p. 1131 & fn. 18.)

. . .

Defendant contends the evidence is insufficient to prove the section 186.22, subdivision (b)(1) gang enhancement—i.e., he committed the Sacramento–Boles shooting for the benefit of the San Francisco BNT gang. We disagree.

In reviewing the sufficiency of the evidence in a criminal case, we review the whole record in the light most favorable to the challenged finding to determine whether it contains evidence that is reasonable, credible, and of solid value from which a reasonable trier of fact could have made that finding. (<u>People v. Johnson</u> (1980) 26 Cal.3d 557, 578.)

" 'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the ... section 186.22, subdivision (b)(1), gang enhancement." (<u>Vang</u>, supra, 52 Cal.4th at p. 1048.) In part II. of the Discussion, ante, we concluded Detective Broberg's opinion that the Sacramento–Boles shooting benefited the BNT gang was properly admitted.

In addition to Detective Broberg's opinion, there was other evidence to support this gang enhancement.

Defendant stipulated he was a BNT member on the date of the Boles shooting. Detective Broberg testified codefendant Givens was a BNT member as well. At a minimum, the evidence showed that defendant and Givens were in Sacramento together at the time and place of the crime.

Upon returning to San Francisco after the Sacramento–Boles shooting, defendant explained his limp to fellow BNT member Sims in the following way. Defendant and "Dominique" (presumably, Givens) were out of town, "hitting licks or whatever" (i.e., robbing someone). They came across a noncompliant victim, a tussle ensued, and Givens fired a shot in his defense, accidentally hitting defendant. While defendant and Sims's conversation was not of the usual gang-bragging variety found in the decisions upon which defendant relies in contrast to this conversation, the conversation's participants, idiomatic language, and routine description of horrific facts suggest the Boles shooting was gang related.

> Finally, defendant's statement to the police indicated he was shot in a gang context. While this statement did not concern the Boles shooting, it nevertheless comprised a gang shooting context.
>
> We conclude the evidence is sufficient to support defendant's section 186.22, subdivision (b)(1) gang enhancement.

Shaw, 2014 WL 4104676, at *4–5.

### D. Objective Reasonableness Under § 2254(d)

The admissibility of Broberg's testimony and expert opinion are matters of state law that are not subject to review here. See Estelle, 502 U.S. at 67–68. The only question under ADEPA is whether the state court reasonably applied Jackson in concluding that the detective's testimony could rationally support findings that the murder and related charges were gang-related within the meaning of California Penal Code section 186.22(b).[8]

The Court of Appeal could reasonably conclude that Broberg's testimony supported the necessary jury findings that the murder and related charges were gang-related and intended to benefit the Kirkwood BNT gang. In rendering his opinion that the offenses were gang-related, Broberg did not rely solely on petitioner's status as a gang member. He considered that the gang's primary activities include narcotics violations or sales, weapons violations, guns, assault rifles, robberies, carjacking, and witness intimidation. RT 812. He also explained that the culture of gangs is based on fear and respect: in order for a gang to be respected it needs to be feared, and to be feared a gang has to show it is "willing to step up." RT 846. Broberg further explained that gang members talk about "hitting" other gang members or committing robberies, and it is "a very specific act of violence, especially when they are going to shoot somebody." RT 847. Broberg concluded that "[w]hat happened here in Sacramento, that information got back to San Francisco and to individuals back there. So both of the individuals that were involved in this enhanced their reputations by the use of the gun and by shooting the individual that they were attempting to rob."

////

---

[8] In order to find the gang enhancement allegations true, the jury had to find that petitioner "committed or attempted to commit the crime for the benefit of, at the direction of, or in association with a criminal street gang" and "intended to assist, further, or promote criminal conduct by gang members." CT 364.

19

1  RT 847–48. Broberg agreed that the murder and related charges benefited gang members and the

2  gang's reputation in intimidation in the community as word spread. RT 848.

3  The Court of Appeal was also not unreasonable in finding that additional evidence

4  supported the jury's determination on the gang enhancement. This includes that petitioner and

5  Givens were members of the gang together, they were in Sacramento together at the time of the

6  murder, and petitioner explained his limp to a gang member as a result of being accidentally shot

7  by Givens during a robbery. Shaw, 2014 WL 4104676 at *5. Based on Broberg's testimony,

8  petitioner's actions, and petitioner's stipulation that he was a member of the Kirkwood BNT

9  gang, a rational juror could conclude that petitioner was primarily acting for the benefit of the

10  gang. There is nothing objectively unreasonable about the state court's analysis in this regard.

11  For these reasons, it cannot be said that no rational juror could have found proof beyond a

12  reasonable doubt that the offenses were intended to benefit the gang. On this record, the Court of

13  Appeal did not unreasonably apply the Jackson standard. Petitioner is not entitled to relief on this

14  claim.

15  III.  Claim Three:  Evidence of the San Francisco Shooting Violated Petitioner's Due
16       Process Rights

17       A. Petitioner's Allegations

18  Petitioner alleges that graphic photos and testimony regarding the San Francisco shooting

19  should not have been admitted and its admission violated his due process rights. ECF No. 1 at 8.

20       B. The Clearly Established Federal Law

21  "[E]vidence erroneously admitted warrants habeas relief only when it results in the denial

22  of a fundamentally fair trial in violation of the right to due process." Briceno, 555 F.3d at 1077

23  (citing Estelle, 502 U.S. at 67–68). "[I]t is not the province of a federal habeas court to

24  reexamine state-court determinations on state-law questions." Estelle, 502 U.S. at 67–68. In

25  conducting habeas review, a federal court is limited to deciding whether a conviction violated the

26  Constitution, laws, or treaties of the United States. Id. The court's habeas powers do not allow

27  for the vacatur of a conviction "based on a belief that the trial judge incorrectly interpreted the

28  California Evidence Code in ruling" on the admissibility of evidence. Id. at 72. The United

States Supreme Court has never held that the admission of any type of evidence violates due process. Holley, 568 F.3d at 1101 (9th Cir. 2009).

        C.  The State Court's Ruling

Petitioner raised his due process claim on direct appeal. The California Court of Appeal decision, Shaw, 2014 WL 4104676, constitutes the last reasoned decision on the merits because the state supreme court denied discretionary review, Lodged Doc. 6. See Ylst, 501 U.S. 797; Ortiz, 704 F.3d at 1034.

The California Court of Appeal ruled as follows:

> Defendant contends the trial court erred prejudicially by allowing the prosecution to admit inflammatory evidence of the July 16, 2009 San Francisco drive-by shooting. We disagree.

> In an in limine hearing on this matter, the trial court carefully circumscribed the evidence of this shooting that would be admitted, stating, "We want[ ] [this evidence] just to be very sanitized. There was a shooting in San Francisco [directed toward the driver of the car], and [defendant] was identified, and the casings match [ (i.e., the nine-millimeter casings found at the Sacramento–Boles shooting and the San Francisco shooting) ]. That's it." The jury would not hear that the driver had been fatally shot, nor that defendant was present when Givens apparently shot at the driver the day before, nor that this shooting may have been gang related.

> And at an Evidence Code section 402 admissibility hearing at which the victim-front passenger witness testified about the San Francisco shooting, the trial court reiterated: "She[ ] [will] testify in her belief, consistent with prior reports, that she saw [defendant] fire a gun in a car in which she was sitting. And that's the relevance for our purpose because of the casings."

> At trial, the front passenger witness testified along these lines, noting the several shots fired at her car. Additionally, she noted that her three children and the driver's mother were in the back seat of the car during the shooting;[9] and the prosecutor introduced into evidence a photograph showing six bullet holes in the car's driver-side door, and a bullet fragment that was found on the rear floorboard.

> Defendant argues this additional evidence was inflammatory and impossible to ignore, the proverbial "elephant in the room"; as characterized by defendant, this evidence showed he fired nine shots, unprovoked, at a vehicle occupied by women and children.

---

[9] [Footnote 9 in original]  This additional evidence involving the children and the driver's mother was not mentioned in the pretrial evidentiary admissibility hearings.

We disagree that the admission of this additional evidence constitutes reversible error.

First, defendant did not make a specific objection to this additional evidence on the record. A judgment shall not be reversed because evidence was erroneously admitted, unless a timely, specific, legally supported objection to the evidence was made, and the evidence's admission resulted in a miscarriage of justice. (Evid. Code, § 353.)

Second, in the in limine proceedings, the prosecutor had agreed to limit the evidence of the San Francisco shooting in line with a proposal defendant had made—i.e., a person claimed to have seen defendant fire the gun, and the casings in the San Francisco shooting matched those in the Sacramento–Boles shooting—if defendant agreed that the identification of him was accurate. Otherwise, the prosecutor intended to present evidence to corroborate the front seat passenger witness's testimony regarding the San Francisco shooting. Defendant declined the prosecutor's qualification, believing it would foreclose him from attacking the credibility of the San Francisco witness.

Third, defendant's counsel, during cross-examination, questioned the front passenger witness in a manner that had her explain that after the shooting she checked on her children (to make sure they were all right).

Fourth, the trial court instructed the jury, "If you decide that [defendant] committed the uncharged act [ (i.e., the San Francisco shooting) ], you may, but are not required to consider that evidence for the limited purpose of deciding whether or not the ballistics evidence demonstrates that the nine-millimeter shell casings recovered from the crime scene in [the Sacramento] case were fired from the same gun. [¶] Do not consider this evidence for any other purpose."

Fifth, and finally, given the casings-based relevance of the San Francisco shooting to the Sacramento shooting, at a minimum the jury was going to hear a witness testify that she saw defendant shoot into a car in which she was a passenger. For defendant, then, there was no escaping from evidence that he had at least once shot at people (presumably, unjustifiably). The additional evidence challenged here was not all that much more inflammatory than this relevant evidence that was certain to be admitted.

We conclude the admission of the challenged additional evidence concerning the San Francisco shooting does not constitute reversible error.

Shaw, 2014 WL 4104676, at *2–4.

    D. Objective Reasonableness Under § 2254(d)

As noted above, habeas relief is available for the admission of prejudicial evidence only if

the admission was fundamentally unfair and resulted in a denial of due process. Estelle, 502 U.S. at 72. A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005). "Evidence introduced by the prosecution will often raise more than one inference, some permissible, some not" and it is up to "the jury to sort them out in light of the court's instructions." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). Constitutional due process is violated only if there are no permissible inferences that may be drawn from the challenged evidence. Id.

The Court of Appeal found that the evidence was properly admitted in combination with an instruction to the jury that it may, but is "not required to consider that evidence for the limited purpose of deciding whether or not the ballistics evidence demonstrates that the nine-millimeter shell casings recovered from the crime scene in [the Sacramento] case were fired from the same gun. [¶] Do not consider this evidence for any other purpose." Shaw, 2014 WL 4104676, at *3 (quotations omitted). The Court of Appeal also found that because of the relevance of the casings of the San Francisco shooting to the Sacramento shooting, "at a minimum the jury was going to hear a witness testify that she saw defendant shoot into a car that he had at least once shot at people (presumably, unjustifiably)." Id. The state court concluded that the additional evidence "was not all that much more inflammatory than this relevant evidence that was certain to be admitted." Id. Although the additional evidence may have been inflammatory, the Court of Appeal was not unreasonable in concluding that it was not unfairly admitted and the jury still would have heard the relevant evidence of the San Francisco shooting—that petitioner had fired at a car, presumably unjustifiably, three weeks before the Sacramento shooting.

Even assuming *arguendo* that the additional evidence was admitted in error, petitioner is only entitled to relief if the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). The separate evidence submitted during the trial created a strong case against petitioner. This includes: (1) Spade's testimony that a gun was found in her living room the day before the shooting and petitioner took the gun; (2) Spade's testimony that she heard gunshots and saw petitioner running to the other side of the apartments with a gun in his hand saying, "I got hit. I got hit;" (3) Flowers

also testified about the gun found in her apartment; (4) Flowers' testimony that right after the shooting she saw petitioner running to the apartment below her apartment limping, saying he had been hit, and asking someone to give him a ride to the hospital; (5) Sims' testimony that he saw petitioner limping and petitioner told him that Givens shot him during an attempted robbery; (6) Boles' fiancée Lathum's testimony that she saw Boles standing with petitioner just before the shooting; (7) Givens' testimony that petitioner was at the apartment complex at the time of the shooting and handed him two guns in a vacant apartment shortly after the shooting; and (8) Givens' testimony that he purchased one of the guns he saw at the apartment complex after the shooting from petitioner and that petitioner told him the gun had been involved in the Sacramento shooting. Thus, it is unlikely that the admission of additional evidence of the San Francisco shooting—namely a photograph of the vehicle and the fact that the front passenger testified her three children and the driver's mother were in the back seat of the car—had a substantial and injurious effect or an influence in determining the jury's verdict.

Finally, relief is unavailable under the AEDPA. The state court's decision cannot constitute an unreasonable application of clearly established federal law in the absence of Supreme Court precedent finding due process violated by admission of inflammatory evidence. There is no such precedent, and therefore no exception to § 2254's bar to relief. See Holley, 568 F.3d at 1101.

For these reasons, petitioner is not entitled to relief on this claim.

IV.    Claim Four:  Ineffective Assistance of Counsel for Not Timely Asserting Petitioner's Right to a Speedy Trial

A. Petitioner's Allegations and Pertinent Record

Petitioner claims that after the first jury hung on the California Penal Code section 12022.53(e) enhancement, petitioner was retried more than sixty days after the mistrial without a time waiver. ECF No. 1 at 10. Petitioner alleges that trial counsel should have timely asserted a right to a speedy trial. Id.

The trial court record reflects the following. Mistrial on the gun enhancement was formally declared on May 31, 2012, when the jury returned its verdicts. On that date, petitioner

waived time through sentencing.  RT 1346.  The defense subsequently moved for a continuance

of the sentencing hearing.  CT 439.  The prosecutor's intention to retry petitioner on the gun

enhancement was confirmed at the sentencing hearing on September 14, 2012.  RT 1369-70.  A

trial date of September 28, 2012 was requested, RT 1370, and trial was subsequently continued,

CT 19-21.

On December 10, 2012, the last day to begin trial pursuant to the parties' calculations, the

court acknowledged that petitioner's trial had not gone forward the previous week because his

counsel needed to be with a very ill friend who passed away over the weekend.  RT 1374.

Petitioner's counsel requested a further one-week continuance to December 17, 2012 as he had

been appointed executor of his friend's estate.  RT 1374–75.  The court asked petitioner if he was

okay with starting his trial the following Monday as opposed to on December 10, 2012 and

petitioner responded, "Yes, sir."  RT 1375.  Petitioner's waiver was noted on the record.  RT

1375.  On December 18, 2012,[10] the court noted petitioner's counsel was not feeling well and

proceedings were continued for another day with petitioner's agreement on the record.  RT 1380.

On December 19, 2012, the trial court heard arguments regarding what evidence from the

first trial would be presented in the second trial.  RT 1381–1416.  Petitioner's counsel moved to

continue the jury trial for a period of six months so the Court of Appeal could either affirm or

overturn the previous verdicts, which he argued would "preclude this court from giving what

could turn out to be as not relevant factual basis for a determination as a finding."  RT 1411.  In

the alternative, petitioner's counsel requested a recess until January 2, 2013, which would give

counsel time to "do some more research on a few other issues that deal with the right of

confrontation."  RT 1411.  The court denied the motion to continue the trial and ordered the

parties to return on January 2, 2013 to begin trial.  RT 1414–16.  On January 2, 2013, the trial was

continued with no explanation in the record.  RT 1418.

////

---

[10]  The Reporter's Transcript indicates the proceedings took place on December 18, 2013.  RT
1378.  The court presumes the 2013 is a typo and should be 2012 given the rest of the
proceedings surrounding this day were in 2012.  See RT 1373, 1381.

B. The Clearly Established Federal Law

To establish a constitutional violation based on ineffective assistance of counsel, a petitioner must show (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 688, 692 (1984). Prejudice means that the error actually had an adverse effect on the defense. There must be a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. Id. at 694. The court need not address both prongs of the Strickland test if the petitioner's showing is insufficient as to one prong. Id. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.

C. The State Court's Ruling

Petitioner raised his ineffective assistance of counsel claim on direct appeal. The California Court of Appeal decision, Shaw, 2014 WL 4104676, constitutes the last reasoned decision on the merits because the state supreme court denied discretionary review, Lodged Doc. 6. See Ylst, 501 U.S. 797; Ortiz, 704 F.3d at 1034.

The California Court of Appeal ruled as follows:

> Defendant contends his counsel was ineffective in untimely asserting defendant's statutory speedy trial right (§ 1382, subd. (a)(2)) on the retrial of the section 12022.53(e) enhancement. We disagree, finding defendant was not prejudiced.
>
> Section 1382, subdivision (a)(2), which implements in part the state constitutional right to a speedy trial, directs a trial court, among other things, to dismiss a mistried felony action when a defendant is not retried on it within 60 days of the mistrial, unless good cause to the contrary is shown. (People v. Villanueva (2011) 196 Cal.App.4th 411, 422–423 (Villanueva).)
>
> Here, the trial court declared on May 31, 2012, a mistrial on the section 12022.53(e) enhancement, but defense counsel did not move to dismiss the retrial until its commencement in early January 2013. The trial court denied defendant's motion as untimely.
>
> To establish ineffective assistance of counsel, defendant must show (1) his counsel failed to act as a reasonably competent attorney, and (2) prejudice resulted (i.e., there is a reasonable probability defendant would have fared better in the absence of counsel's failing—a probability sufficient to undermine confidence in the outcome). (People v. Gates (1987) 43 Cal.3d 1168, 1183, overruled

on another point in <u>People v. Williams</u> (2010) 49 Cal.4th 405, 458–459.) If a defendant cannot show prejudice, a court need not determine whether counsel performed deficiently. (<u>People v. Hayes</u> (1990) 52 Cal.3d 577, 608, 612.)

Defendant concedes the law is settled that an enhancement on which a jury has deadlocked may be retried "in isolation" after the jury has convicted on the offense underlying the enhancement. (<u>People v. Anderson</u> (2009) 47 Cal.4th 92, 98, 123 (<u>Anderson</u>).) Defendant argues, though, that since case law generally does not view an enhancement as existing independently from its underlying offense, an enhancement retrial that is dismissed on speedy trial grounds under section 1382, subdivision (a)(2) cannot be refiled without pleading the underlying offense; but the underlying offense, defendant continues, cannot be repleaded because the constitutional principle of double jeopardy precludes such pleading as defendant has already been tried on that offense. Relying on this legal Catch–22, defendant claims his counsel prejudiced him by failing to timely assert defendant's statutory speedy trial right of his section 12022.53(e) enhancement retrial. (§ 1382, subd. (a)(2).) Had defense counsel timely asserted this right, the section 12022.53(e) enhancement retrial would have been dismissed without possible refiling.

For three reasons, we do not see the conundrum that defendant does.

First, our state's highest court, in <u>Anderson</u>, has concluded that double jeopardy does not prohibit retrial of a mistried enhancement "*in isolation*" where a jury has convicted the defendant of the offense underlying the enhancement but has deadlocked on the enhancement. (<u>Anderson</u>, <u>supra</u>, 47 Cal.4th at p. 98, italics added.) This situation is similar to the one before us; in this context, an enhancement can be deemed to exist independently of the underlying offense for the procedural purpose of its retrial (although the trier of fact in the retrial will presumably have to be told the defendant has been found guilty of the underlying offense; and, indeed, this is what happened in defendant's enhancement retrial here). (See <u>Anderson</u>, <u>supra</u>, 47 Cal.4th at p. 124 (conc. opn. of Moreno, J.).)

Second, defendant cannot claim that the section 1382 speedy trial right applies to the retrial of his mistried section 12022.53(e) enhancement, without also acknowledging that section 1387 applies as well. Sections 1382 and 1387 are part of "a series of statutes, commencing with ... section 1381, which are a construction and implementation of the California Constitution's speedy trial guarantee (Cal. Const., art. I, § 15)." (<u>Villanueva</u>, <u>supra</u>, 196 Cal.App.4th at p. 422.) Under section 1387, a single dismissal of a felony action, on speedy trial grounds, is not a bar to a second prosecution of the matter. (<u>Villanueva</u>, at p. 417; § 1387, subd. (a); 5 Witkin & Epstein, Cal. Crim. Law (4th ed. 2012) Criminal Trial, § 488, p. 754.) Consequently, even if defense counsel had timely and successfully asserted defendant's speedy trial right of the section 12022.53(e) enhancement, with a resultant dismissal of that

27

enhancement prosecution, the prosecutor, under section 1387, could have retried "in isolation" the enhancement in a second proceeding. Defendant cannot invoke the right provided by section 1382 without meeting the responsibility required by section 1387. Accordingly, defendant was not prejudiced by his counsel's alleged ineffectiveness.

And, third, defendant has not been prejudiced in any broader legal sense. The section 12022.53(e) enhancement retrial did not violate: (1) double jeopardy, because the original jury deadlocked on this enhancement allegation but convicted on its underlying offense; (2) due process, because defendant was originally charged with this enhancement; or (3) any principles of fairness, because nothing was sprung on defendant to his disadvantage—he was simply retried in customary fashion on a matter on which the first jury had deadlocked. (See Anderson, supra, 47 Cal.4th at pp. 121–122.)

In the end, then, as in Anderson, there was " 'no legal or practical barrier' " to prevent the retrial of defendant's section 12022.53(e) enhancement had his counsel successfully moved to dismiss the first retrial on speedy trial grounds. (Anderson, supra, 47 Cal.4th at p. 121.) Consequently, defendant cannot show his counsel was ineffective because he cannot show his counsel's alleged ineffectiveness prejudiced him.

Shaw, 2014 WL 4104676, at *5–7.

### D. Objective Reasonableness Under § 2254(d)

The conclusion of the Court of Appeal that petitioner's trial counsel did not render ineffective assistance is not contrary to or an unreasonable application of clearly established federal law. Here, petitioner fails to establish actual prejudice. For the reasons expressed by the Court of Appeal, even if trial counsel had timely filed a motion as petitioner claims he should have done, the state's case would not necessarily have been dismissed because the prosecutor could have re-filed the enhancement charge under California Penal Code section 1387. See, e.g., Smith v. Curry, No. CIV S-3-1871 LKKKJMP, 2007 WL 841747, *24–25 (E.D. Cal. Mar. 20, 2007) (finding that petitioner failed to establish prejudice resulting from counsel's failure to file a motion to dismiss because, even assuming the trial court had granted that motion, no evidence that the charge would not have been refiled (citing CAL. PENAL CODE §§ 1387, 1387.1)), report and recommendation adopted sub nom. Smith v. Kane, No. CIVS031871 LKK KJMP, 2007 WL 2253520 (E.D. Cal. Aug. 3, 2007), aff'd sub nom. on other grounds Smith v. Curry, 580 F.3d 1071 (9th Cir. 2009). Counsel cannot be ineffective for failing to timely move to dismiss the

enhancement where it is likely that the prosecutor simply would have been permitted to refile the charges. See Strickland, 466 U.S. at 697. Petitioner can only speculate whether the trial court would have denied the prosecution an opportunity to refile the charges following a timely motion. Such speculation cannot establish prejudice. Gonzalez v. Knowles, 515 F.3d 1006, 1016 (9th Cir. 2008) (explaining that speculation is "plainly insufficient" to establish Strickland prejudice). The state court's rejection of petitioner's claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent. See 28 U.S.C. § 2254(d)(1). Accordingly, petitioner is not entitled to relief on this claim.

CONCLUSION

For all the reasons explained above, the state courts' denial of petitioner's claims was not objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be DENIED. It is FURTHER RECOMMENDED that a certificate of appealability, see 28 U.S.C. § 2253(c), be DENIED.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. See 28 U.S.C. § 2253(c)(2). Any reply to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: December 17, 2019

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE